LOUIS R. MILLER, State Bar No. 54141
smiller@millerbarondess.com
MARTIN PRITIKIN, State Bar. No. 210845
mpritikin@millerbarondess.com
BRIAN PROCEL, State Bar No. 218657
bprocel@millerbarondess.com
**MILLER BARONDESS, LLP**
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400

Attorneys for Plaintiffs

PAUL J. COUCHOT, State Bar No. 131934
PETER W. LIANIDES, State Bar No. 160517
CHARLES LIU, State Bar No. 190513
**WINTHROP COUCHOT, P.C.**
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4165
Facsimile: (949) 720-4111

General Insolvency Counsel For Administratively Consolidated Debtors-in-Possession




ORIGINAL

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400 FAX (310) 552-8400

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA -- SANTA ANA DIVISION**

**Bankruptcy Cases to which Adversary Proceeding Relates:**

In re

PALMDALE HILLS PROPERTY, LLC, a Delaware limited liability company; SUNCAL BEAUMONT HEIGHTS, LLC, a Delaware limited liability company; SCC/PALMDALE, LLC, a Delaware limited liability company; JOHANNSON RANCH, LLC, a Delaware limited liability company; SUNCAL SUMMIT VALLEY, LLC, a Delaware limited liability company; SUNCAL EMERALD MEADOWS, LLC, a Delaware limited liability company; SUNCAL BICKFORD RANCH, LLC, a Delaware limited liability company; ACTON ESTATES, LLC, a Delaware limited liability company; SEVEN BROTHERS, LLC, a Delaware limited liability company; SJD DEVELOPMENT CORP., a Delaware corporation; KIRBY ESTATES, LLC, a Delaware limited liability company; SUNCAL COMMUNITIES I, LLC, a Delaware limited liability company; SUNCAL COMMUNITIES III, LLC, a Delaware

**CASE NO. 8:08-bk-17206-ES**

Chapter 11

Jointly Administered with Voluntary Cases Nos.
8:08-bk-17209-ES; 8:08-bk-17240-ES
8:08-bk-17224-ES; 8:08-bk-17242-ES
8:08-bk-17225-ES; 8:08-bk-17245-ES
8:08-bk-17227-ES; 8:08-bk-17246-ES
8:08-bk-17230-ES; 8:08-bk-17231-ES
8:08-bk-17236-ES; 8:08-bk-17248-ES
8:08-bk-17249-ES; 8:08-bk-17573-ES
8:08-bk-17574-ES; 8:08-bk-17575-ES

Involuntary Cases Nos.
8:08-bk-17404-ES; 8:08-bk-17407-ES;
8:08-bk-17408-ES; 8:08-bk-17409-ES;
8:08-bk-17458-ES; 8:08-bk-17465-ES;
8:08-bk-17470-ES; 8:08-bk-17472-ES;
8:08-bk-17588-ES

limited liability company; NORTH ORANGE DEL RIO LAND, LCC, a Delaware limited liability company; TESORO SF, LLC, a Delaware limited liability company; SCC COMMUNITIES, LLC, a Delaware limited liability company;

Jointly Administered Voluntary Debtors and Debtors-in-Possession; and

LB/L-SUNCAL OAK VALLEY, LLC, a Delaware limited liability company; LB/L-SUNCAL NORTHLAKE LLC, a Delaware limited liability company; SUNCAL CENTURY CITY LLC, a Delaware limited liability company; SUNCAL PSV LLC, a Delaware limited liability company; DELTA COVES VENTURE LLC, a Delaware limited liability company; SunCal Torrance LLC, a Delaware limited liability company; SUNCAL OAK KNOLL LLC a Delaware limited liability company; SUNCAL MARBLEHEAD, LLC, a Delaware limited liability company; and SUNCAL HEARTLAND, LLC, a limited liability company,

Involuntary Debtors

**ADVERSARY PROCEEDING**

**Creditor Plaintiffs:**
SCC ACQUISITIONS, INC., a California corporation; SUNCAL MANAGEMENT, LLC, a Delaware limited liability company;

**SunCal Equity Member Plaintiffs:**
SUNCAL COMMUNITIES II, LLC, a Delaware limited liability company; SCC/OAK VALLEY, LLC, a Delaware limited liability company; SCC/NORTHLAKE, LLC, a Delaware limited liability company; SUNCAL DELTA COVES, LLC, a Delaware limited liability company; SCC JV VENTURES LLC, a Delaware limited liability company

**Voluntary Debtor Plaintiffs**
PALMDALE HILLS PROPERTY, LLC, a Delaware limited liability company; SUNCAL BEAUMONT HEIGHTS, LLC, a Delaware limited liability company; SCC/PALMDALE, LLC, a Delaware limited liability company; JOHANNSON RANCH, LLC, a Delaware limited liability company; SUNCAL SUMMIT VALLEY, LLC, a Delaware limited liability company; SUNCAL

**Adversary Proceeding No. ______**

**COMPLAINT FOR:**

**1) EQUITABLE SUBORDINATION;**

**2) INTENTIONAL MISREPRESENTATION;**

**3) NEGLIGENT MISREPRESENTATION;**

**4) BREACH OF CONTRACT;**

**5) BREACH OF FIDUCIARY DUTY;**

**6) TURNOVER OF PROPERTY; AND**

**7) ATTORNEYS' FEES**

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

EMERALD MEADOWS, LLC, a Delaware limited liability company; SUNCAL BICKFORD RANCH, LLC, a Delaware limited liability company; ACTON ESTATES, LLC, a Delaware limited liability company; SEVEN BROTHERS, LLC, a Delaware limited liability company; SJD DEVELOPMENT CORP., a Delaware corporation; KIRBY ESTATES, LLC, a Delaware limited liability company; NORTH ORANGE DEL RIO LAND, LCC, a Delaware limited liability company; TESORO SF, LLC, a Delaware limited liability company; SCC COMMUNITIES, LLC, a Delaware limited liability company; SUNCAL COMMUNITIES I, LLC, a Delaware limited liability company; SUNCAL COMMUNITIES III, LLC, a Delaware limited liability company;

**Other Plaintiffs:**
SCC ACQUISTIONS, LLC, a Delaware limited liability company; and BRUCE ELIEFF, an individual,

Plaintiffs,

v.

**Lehman Lender Defendants:**
LEHMAN ALI, INC., a Delaware corporation; OVC HOLDINGS, LLC, a Delaware limited company; NORTHLAKE HOLDINGS, LLC, a Delaware limited liability company;

**Lehman Equity Member Defendants:**
LBREP II/SUNCAL LAND FUND MEMBER, LLC, a Delaware limited liability company; SCLV OAK VALLEY, LLC, a Delaware limited liability company; SCLV NORTHLAKE, LLC, a Delaware limited liability company; LB/L–DUC III MASTER LLC, a Delaware limited liability company; SC MASTER HOLDINGS II LLC, a Delaware limited liability company;

**Other Defendants:**
LV PACIFIC POINT, LLC, a Delaware corporation; and DOES 1 through 50, inclusive,

Defendants.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552 8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

## SUMMARY OF ACTION

1. This case is about a major Wall Street financial institution, Lehman Brothers ("Lehman"), that bilked California businesses out of hundreds of millions of dollars before declaring bankruptcy in New York, where it is now hoarding billions in cash. Lehman perpetrated a fraud on creditors of monumental proportion, with drastic and devastating consequences. With this action, Plaintiffs seek to remedy those consequences.

### A. Lehman Pre-Bankruptcy

2. The story begins several years ago when Lehman undertook to loan various entities affiliated with the SunCal Companies ("SunCal"), a California-based land developer, in excess of $2 billion for the acquisition and development of master-planned communities located throughout California, including the entitlement and construction of residences, schools, streets, bridges, golf courses, commercial buildings and all the infrastructure attendant thereto (collectively at times the "Projects"). For the most part, the loans were secured by first priority trust deeds on those properties. Through entities that Lehman owned and controlled, Lehman was SunCal's lender in 19 Projects and its equity partner in nine of the 19 projects.

3. SunCal is a highly-experienced and successful real estate developer in business for over 70 years. It manages virtually all aspects of real estate development, from acquiring properties and obtaining governmental entitlements to construction and build-out, culminating in the sale of lots to merchant builders. For years, the practice was for Lehman to fund the Projects, and for SunCal to control and manage the development process including, among other things, contracting and dealing with and paying vendors, contractors, and municipalities and governmental agencies.

4. In or about mid-2007, that practice changed. As the real estate market began to cool, Lehman took over financial control and informed SunCal that going forward it would approve or have a veto over all expenditures, and that it alone would decide if and when to advance funds for the Projects. Since Lehman held the purse-strings—and was imposing its control—SunCal had no choice in the matter and acquiesced.

5. Meanwhile, Lehman represented to SunCal that it would continue funding the Projects and paying the various contractors and creditors for the millions of dollars of goods and

services they provided to the Projects. In fact, Lehman decided what work would be performed on the Projects and specifically promised to pay for the work, which enhanced the value of the Projects significantly. In doing so, Lehman imposed its complete financial control over the Projects.

6. During this time—from the second half of 2007 into 2008—property values were in decline, and SunCal periodically so informed Lehman. SunCal also provided Lehman with detailed budgets regarding the critical needs of the Projects in order to ensure continued progress and ameliorate any decline in value to the extent possible. During this period, SunCal worked on the Projects with its vendors and contractors and relied on Lehman's promises and representations of funding.

7. Unbeknown to SunCal, Lehman had its own agenda for taking financial control. On information and belief, in order to mask the decline in value of the Projects—and to minimize write-downs that would have further weakened its own declining financial position—Lehman wanted to, and did, create the appearance that it would recoup all, or a substantial portion, of its multi-billion dollar investment in the SunCal projects.

8. On information and belief, Lehman sought to minimize to the outside world the Projects' decline in value, keep SunCal and the other creditors on the hook and make it appear that the Projects were viable, being supported and would continue going forward. This was done to prop up Lehman's weakening stock price for the benefit of the securities markets and to entice potential investors Lehman was pursuing to fortify its faltering finances.

9. In furtherance of this scheme, Lehman threatened SunCal in an effort to obtain its consent to a restructuring agreement. For instance, Lehman stated it would ensure that SunCal would be exposed to undue tax liability and that Bruce Elieff, SunCal's CEO and owner, would be "hung out" on bonds posted in connection with the projects if SunCal refused to enter into the restructuring agreement.

10. In May 2008, faced with no other option, SunCal agreed to Lehman's supposed restructuring agreement ("Restructuring Agreement"). Under the terms of the Restructuring Agreement, Lehman would act as both lender and equity partner and recoup its investment plus interest and more. As the lender, Lehman committed to restructure the existing obligations of the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

Projects; and Lehman agreed to provide continuing financing that was necessary to keep the projects going. Ultimately, it was this scheme to misrepresent and inflate asset value that undermined Lehman's credibility and contributed to its demise.

11. Neither SunCal nor the Project creditors had any knowledge of, or participation in, the Lehman scheme as set forth herein. They are, in effect, its unwitting victims. Had SunCal known of this scheme, it could have—and would have—acted to avert, or at least mitigate, the Projects' diminution in value and harm to creditors.

**B. Lehman Post-Bankruptcy**

12. Even after filing for bankruptcy in September 2008, Lehman for a time continued to tell SunCal that it would fund ongoing critical expenses of the Projects, and continued to encourage and authorize SunCal to incur expenses in connection with the Projects. SunCal and the creditors reasonably and detrimentally relied on the Restructuring Agreement and on the representations and assurances by Lehman made before and after that Agreement was entered into.

13. But Lehman's funding never materialized anywhere close to what was promised and needed. As a result, the value of the Projects has been diminished and continues to diminish. Many of the Projects have been forced into bankruptcy. Worse, approximately 450 creditors, including many small California businesses, have had their bills go unpaid for months, resulting in great harm and hardship to those who relied on and trusted Lehman. The unpaid bills and liabilities now aggregate approximately $150 million.

14. Lehman's deception, and the harm its actions have caused, does not stop there. The Projects themselves are falling into a state of serious disarray. In the dry season, they encountered problems with dust and fire control and friable asbestos, among other things; and they are now experiencing flooding, erosion, problems with unmonitored levees and partially constructed bridges, and other serious health and safety hazards. The Projects are further threatened with the loss of their governmental entitlements, which are critical to avoid massive disruptions in the development process and to maintain value.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

15. Not only did Lehman make repeated promises to fund critical needs but fail to do so, Lehman also secretly withdrew millions of dollars of funds from restricted accounts that had been established precisely to meet those needs—a blatant money grab.

16. Lehman is orchestrating the foregoing in a squeeze play: to foreclose on its first trust deed liens and to usurp the properties for itself. If successful in this scheme, Lehman will then "resurrect" the Projects, in the process generating millions of dollars in unnecessary and wasted expense over the next several years, thereby further burdening the Projects and pushing them deeper into financial straits—to the harm and detriment of the creditors and investors therein.

17. This self-serving scheme will harm—and is harming—the innocent creditors including the Plaintiffs herein. Lehman has already taken action to preclude the Projects from obtaining necessary funds from a ready, willing and able lender.

18. Lehman has brazenly demanded that SunCal step aside and allow foreclosures on the Projects to proceed, leaving the creditors without any effective recourse. On information and belief, and based on the course of dealings over the past several years, Lehman both pre- and post-bankruptcy has no in-house expertise or hands-on experience in the complex area of land development, whereas over the course of its history SunCal has acquired that expertise and experience and has exercised it at a very high and successful level in connection with many major land development projects.

19. Various Lehman affiliates have acted in concert to stiff the creditors and effectuate foreclosures through this scheme. For instance, the Lehman lending entity, Lehman ALI, Inc. ("Lehman ALI")—which is not in bankruptcy—surreptitiously transferred first deeds of trust on the properties to an affiliate, Lehman Commercial Paper, Inc. ("LCPI"), just days before LCPI filed for bankruptcy. Lehman engaged in this action in derogation of the rights of the Projects' creditors and investors.

20. LCPI and the other bankrupt Lehman entities are orchestrating this scheme to impede the reorganization of the Projects and to squeeze SunCal and force it out of the Projects. Lehman also controls the non-bankrupt Lehman entities, including the Lehman equity partners in some of the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

Projects, and through its manipulation of them is attempting to block any reorganization of the Projects in bankruptcy and preclude payment of the creditors.

21. This is a blatant conflict of interest—Lehman is acting against its own (and SunCal's) interests as an equity owner in order to benefit its, Lehman's, interest as a lender. For instance, Lehman has taken positions to the detriment of the equity interest, including: (1) failing to fund the Projects or otherwise provide necessary capital; (2) refusing to pay creditors even when capital was available; and (3) failing to preserve the assets, including efforts to prevent the debtors from declaring bankruptcy. Lehman undertook the foregoing actions to the detriment of the equity interest in order to increase the value of the Projects when it foreclosed as lender.

22. On information and belief, Lehman has amassed and has available in excess of $5 billion in cash from which it easily could—and should—pay the Projects' creditors. Lehman has failed and refused to pay the creditors without good cause.

23. Accordingly, this lawsuit is to obtain redress for the creditors by way of:

(a) equitably subordinating all of Lehman's claims and interest in the Projects;

(b) transferring the liens on the subordinated claims to the estates; and

(c) recovering any and all compensatory damages caused by Lehman's wrongful conduct, plus punitive and other damages and relief as permitted by law.

24. This adversary proceeding is filed against defendants who are not in the bankruptcy proceedings involving Lehman Brothers in New York. Plaintiffs hereby reserve the right to seek relief from stay to name any and all Lehman-related entities, agents and/or individuals as defendants herein as necessary, and/or to name other defendants as necessary, to obtain and effectuate full and complete relief for the creditors.

## STATEMENT OF JURISDICTION AND VENUE

25. The Bankruptcy Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (C), (E), (H), (K), and (O), 157(c)(1), and 1334.

26. Venue properly lies in this judicial district in that this civil proceeding arises under title 11 of the United States Code, and/or is related to a case under title 11, as provided for in 28 U.S.C. § 1409(a).

27. The causes of action for equitable subordination under 11 U.S.C. § 510(c) and for a turnover under 11 U.S.C. § 542 are a core proceedings under 28 U.S.C. §157(b). The remaining causes of action for intentional and negligent misrepresentation, breach of fiduciary duty and breach of contract are non-core proceedings that are related to the bankruptcy proceeding under this Court's jurisdiction pursuant to 28 U.S.C. § 157(c)(1). Plaintiffs consent to an entry of final order or judgment on the non-core matters by this Court pursuant to 28 U.S.C. § 157(c)(2).

**PARTIES**

28. As this adversary proceeding deals with a fraudulent scheme by Lehman affecting numerous properties and involving dozens of voluntary and involuntary bankruptcy proceedings, for convenience, the parties are broken down into the following categories:

***Plaintiff Creditors of SunCal/Lehman Joint-Venture Involuntary Debtors:***

29. Plaintiff SCC Acquisition, Inc. ("SunCal") is a California corporation.

30. Plaintiff SunCal Management, LLC ("SunCal Management") is a Delaware limited liability company.

31. SunCal and SunCal Management were signatories to the Restructuring Agreement, along with Lehman, that is at issue in this lawsuit. SunCal is also an indirect parent of the SunCal Equity Members (described below), and so is also an indirect equity holder in the Involuntary Debtors (described below). Both SunCal and SunCal Management bring this action for themselves and as creditors on behalf of the Involuntary Debtors listed in the caption of this Complaint.

***Plaintiff Equity Members in SunCal/Lehman Joint-Venture Involuntary Debtors:***

32. Plaintiff SunCal Communities II, LLC ("SunCal Four-Project Equity Member") is a Delaware limited liability company. SunCal Four-Project Equity Member is the SunCal member in the Lehman SunCal Real Estate Fund LLC ("Lehman SunCal Real Estate Fund"), the parent of four entities that are the subject of involuntary bankruptcy proceedings before this Court: SunCal Century City, LLC ("SunCal Century City"); SunCal PSV, LLC ("SunCal PSV"); SunCal Torrance Properties, LLC ("SunCal Torrance"); and SunCal Oak Knoll, LLC ("SunCal Oak Knoll"). These

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

bankrupt entities are associated, respectively, with the projects known as "Century City," "Palm Springs Village," "Torrance (Del Amo)," and "Oak Knoll," described below.

33. Plaintiff SCC/Oak Valley, LLC ("SunCal Oak Valley Equity Member") is a Delaware limited liability company. SunCal Oak Valley Equity Member is the SunCal member in LB/L-SunCal Oak Valley, LLC ("SunCal Oak Valley"), which is the subject of an involuntary bankruptcy before this Court, and is associated with the "Oak Valley" project described below.

34. Plaintiff SCC/Northlake, LLC ("SunCal Northlake Equity Member") is a Delaware limited liability company. SunCal Northlake Equity Member is the SunCal member in LB/L-SunCal Northlake, LLC ("SunCal Northlake"), which is the subject of an involuntary bankruptcy before this Court, and is associated with the "Northlake" project described below.

35. Plaintiff SunCal Delta Coves LLC ("SunCal Delta Coves Equity Member") is a Delaware limited liability company. SunCal Delta Coves Equity Member was the SunCal member in Delta Coves Master JV LLC ("Delta Coves Master"), the parent of Delta Coves Venture, LLC ("Delta Coves Venture"), which is the subject of an involuntary bankruptcy proceeding before this Court, and is associated with the "Delta Coves" project described below.

36. Plaintiff SCC JV Ventures LLC ("SunCal Marblehead/Heartland Equity Member") is a Delaware limited liability company. SunCal Marblehead/Heartland Equity Member is the SunCal member in the SunCal Master JV LLC ("SunCal Master JV"), which is the sole parent of SunCal Marblehead Heartland Master LLC ("SunCal Marblehead Heartland"), which is itself the parent of two entities that are the subject of involuntary bankruptcy proceedings before this Court: SunCal Marblehead, LLC ("SunCal Marblehead"), associated with the "Marblehead" project described below; and SunCal Heartland, LLC ("SunCal Heartland"), associated with the "Heartland" project described below.

37. The SunCal Four-Project Equity Member, SunCal Oak Valley Equity Member, SunCal Northlake Equity Member, SunCal Delta Coves Equity Member, and SunCal Marblehead/Heartland Equity Member are each referred to herein as a "SunCal Equity Member," and collectively as the "SunCal Equity Members."

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

***Voluntary Debtor Plaintiffs***

38. Plaintiff Acton Estates, LLC ("SunCal Acton Estates") is a Delaware limited liability company, and is owner of the "Acton Estates" project described below.

39. Plaintiff SunCal Beaumont Heights, LLC ("SunCal Beaumont Heights") is a Delaware limited liability company, and is owner of the "Beaumont Heights" project described below.

40. Plaintiff SunCal Bickford Ranch, LLC ("SunCal Bickford Ranch") is a Delaware limited liability company, and is owner of the "Bickford Ranch" project described below.

41. Plaintiff North Orange Del Rio Land, LLC ("SunCal Del Rio") is a Delaware limited liability company, and is owner of the "Del Rio" project described below.

42. Plaintiff SunCal Emerald Meadows, LLC ("SunCal Emerald Meadows") is a Delaware limited liability company, and is owner of the "Emerald Meadows" project described below.

43. Plaintiff SunCal Johannson Ranch, LLC ("SunCal Johannson Ranch") is a Delaware limited liability company, and is owner of the "Johannson Ranch" project described below.

44. Plaintiff SCC Communities, LLC (SCC Communities") is a Delaware limited liability company, and is associated with the "Joshua Ridge" project described below.

45. Plaintiff SJD Partners, Ltd. ("SJD Partners") is a Delaware limited liability company.

46. Plaintiff SJD Development Corp. ("SJD Development") is a Delaware limited liability company, and is the parent of SJD Partners. SJD Partners is the former owner of the "Pacific Point" project described below.

47. Plaintiff Palmdale Hills Property, LLC ("Palmdale Hills") is a Delaware limited liability company.

48. Plaintiff SCC/Palmdale, LLC ("SCC/Palmdale") is a Delaware limited liability company. Palmdale Hills and SCC/Palmdale are associated with the "Ritter Ranch" project described below.

49. Plaintiff SunCal Summit Valley, LLC ("SunCal Summit Valley") is a Delaware limited liability company.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

50. Plaintiff Seven Brothers, LLC, ("Seven Brothers") is a Delaware limited liability company.

51. Plaintiff Kirby Estates, LLC ("Kirby Estates") is a Delaware limited liability company. SunCal Summit Valley, Seven Brothers, and Kirby Estates are associated with the "Summit Valley" project described below.

52. Plaintiff Tesoro SF, LLC ("SunCal Tesoro") is a Delaware limited liability company, and is associated with the "Tesoro" project described below.

53. Plaintiff SunCal Communities I, LLC ("SunCal Communities I") is a Delaware limited liability company, and is associated with the Acton, Beaumont, Bickford Ranch, Emerald Meadows, Johanssen Ranch, and Summit Valley projects.

54. Plaintiff SunCal Communities III, LLC ("SunCal Communities III") is a Delaware limited liability company, and is associated with the Acton, Beaumont, Bickford Ranch, Emerald Meadows, Johanssen Ranch, and Summit Valley projects.

***Other Plaintiffs***

55. Plaintiff SCC Acquisitions, LLC, is a Delaware limited liability company.

56. Plaintiff Bruce Elieff is an individual residing in California. Mr. Elieff is the president of SunCal, a signatory to the Restructuring Agreement at issue in this lawsuit.

***Lehman Lender Defendants***

57. On information and belief, defendant Lehman ALI, Inc. ("Lehman ALI") is a Delaware corporation with its principal place of business in New York, New York, and is a wholly-owned subsidiary of the parent Lehman entity, Lehman Brothers Holdings, Inc. ("LBHI" or "Lehman"), and was—or purported to be—the holder of first deeds of trust and/or pledged interests on all the subject properties in this action.

58. On information and belief, defendant OVC Holdings, LLC. ("OVC") is a Delaware limited liability company with its principal place of business in New York, New York, and is a

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

wholly-owned subsidiary of LBHI. OVC purports to be the assignee of Lehman ALI's loan on the Oak Valley project.

59. On information and belief, defendant Northlake Holdings, LLC. ("Northlake Holdings") is a Delaware limited liability company with its principal place of business in New York, New York, and is a wholly-owned subsidiary of LBHI. Northlake purports to be the assignee of Lehman ALI's loan on the Northlake project.

***Defendant Equity Members in SunCal/Lehman Joint-Venture Involuntary Debtors:***

60. On information and belief, defendant LBREP II/SunCal Land Fund Member, LLC ("Lehman Four-Project Equity Member") is a Delaware limited liability company with its principal place of business in New York, New York, and a wholly-owned subsidiary (directly or indirectly) of, or at least controlled by, LBHI. Lehman Four-Project Equity Member is the Lehman member in the Lehman SunCal Real Estate Fund, parent of four involuntary debtors: SunCal Century City, SunCal Palm Springs Village, SunCal Torrance (Del Amo), and SunCal Oak Knoll.

61. On information and belief, defendant SCLV Oak Valley, LLC ("Lehman Oak Valley Equity Member") is a Delaware limited liability company with its principal place of business in New York, New York, and a wholly-owned subsidiary (directly or indirectly) of, or at least controlled by, LBHI. Lehman Oak Valley Equity Member is purported to be the Lehman member in the SunCal Oak Valley involuntary debtor.

62. On information and belief, defendant SCLV Northlake, LLC ("Lehman Northlake Equity Member") is a Delaware limited liability company with its principal place of business in New York, New York, and a wholly-owned subsidiary (directly or indirectly) of, or at least controlled by, LBHI. Lehman Northlake Equity Member is purported to be the Lehman member in the SunCal Northlake involuntary debtor.

63. On information and belief, defendant LB/L–DUC III Master LLC ("Lehman Delta Coves Equity Member") is a Delaware limited liability company with its principal place of business in New York, New York, and a wholly-owned subsidiary (directly or indirectly) of, or at least

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

controlled by, LBHI. Lehman Delta Coves Equity Member is the Lehman member in Delta Coves Master, the parent of the SunCal Delta Coves involuntary debtor.

64. On information and belief, defendant SC Master Holdings II LLC ("Lehman Marblehead/Heartland Equity Member") is a Delaware limited liability company with its principal place of business in New York, New York, and a wholly-owned subsidiary (directly or indirectly) of, or at least controlled by, LBHI. Lehman Marblehead/Heartland Equity Member is the Lehman member in SunCal Master JV, which is the sole parent of SunCal Marblehead Heartland, which is itself the parent of two bankrupt entities, SunCal Marblehead and SunCal Heartland. The Lehman Four-Project Equity Member, Lehman Oak Valley Equity Member, Lehman Northlake Equity Member, Lehman Delta Coves Equity Member, and Lehman Marblehead/Heartland Equity Member are each referred to herein as a "Lehman Equity Member," and collectively as the "Lehman Equity Members."

***Other Defendants***:

65. On information and belief, defendant LV Pacific Point, LLC ("LV Pacific Point"), is a Delaware limited liability company, with its principal place of business in New York, New York, and a wholly-owned subsidiary (directly or indirectly) of, or at least controlled by, LBHI. LV Pacific Point was a signatory to the contract with Lehman at issue in this litigation, and was the purchaser of the Pacific Point project.

66. On information and belief, the acts and//or omissions complained of herein were done with the express knowledge, consent and/or ratification of the responsible managerial employees, supervisors, directors, members, and/or partners of Lehman ALI, OVC, Northlake Holdings, the Lehman Equity Members, and LV Pacific Point.

## FACTUAL ALLEGATIONS

**SunCal**

67. SunCal is a family-owned and operated California real estate business. Real estate development is a time-intensive, complex undertaking that requires coordination among hundreds of third-party contractors and vendors, as well as local, state and federal governmental agencies, and non-governmental organizations. With more than 70 years of experience in real estate development,

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

SunCal has gained an expertise in these matters, and has formed relationships with many governmental entities and businesses throughout California.

68. SunCal, directly and/or through its affiliates, has entered into numerous agreements with Lehman, directly and/or through its affiliates, whereby Lehman would provide financing for the development of real estate projects, and SunCal would manage and develop those projects. The funding for the purchase and development of the subject property of each project was made through a Lehman entity, ALI or LCPI; and the respective lending entities obtained first priority trust deeds on each property as security for its loan or obtained pledges of equity interests in the entities owning such properties.

69. This lawsuit involves disputes regarding nine development projects associated with nine involuntary bankruptcies before this Court (the "Involuntary Debtors"), and ten development projects associated with seventeen voluntary bankruptcies before this Court (the "Voluntary Debtors").

**The Involuntary Debtors**

70. The Involuntary Debtors whose projects are at issue in this suit include SunCal Northlake, SunCal Oak Valley, SunCal Century City, SunCal PSV, SunCal Torrance, SunCal Oak Knoll, SunCal Delta Coves, SunCal Marblehead, and SunCal Heartland; they are associated, respectively, with the projects known as Northlake, Oak Valley, Century City, Palm Springs Village, Torrance (Del Amo), Oak Knoll, Delta Coves, Marblehead, and Heartland (collectively, the "Involuntary Projects"). Lehman Ali was the lender for each of the Involuntary Projects.

71. In the underlying bankruptcies, the Lehman affiliates OVC and Northlake Holdings LLC purport to be the lenders for the Oak Valley and Northlake Projects, respectively, not Lehman ALI. However, Lehman ALI, not OVC or Northlake Holdings, was the signatory to the parties' May 23, 2008 Restructuring Agreement (defined below), in which Lehman Ali represented itself to be "the Lender with respect to each Loan." If Lehman ALI transferred its interest in the relevant loans to OVC or Northlake Holdings, it did so subsequent to its agreement with Plaintiffs. In any event, recent joint correspondence from Lehman ALI, LCPI, OVC and Northlake Holdings indicates that each of these entities is controlled by the same Lehman-related party. On information and belief,

each of these entities is a participant in the intra-Lehman scheme to wrongfully foreclose on the Projects and stiff SunCal and the myriad creditors who did work at Lehman's behest.

72. For each Involuntary Project, Lehman held an equity interest through a separate entity in addition to extending a loan through Lehman ALI. For both the Northlake and Oak Valley Projects, a single-purpose entity limited liability company ("SPE") was formed, with a SunCal Equity Member and a Lehman Equity Member serving as the members of that SPE. For five Projects—Century City, Palm Springs Village, Torrance (Del Amo), Oak Knoll, and Delta Coves—the SunCal and Lehman Equity Members were members of the parent of the SPE that ultimately filed for bankruptcy in this Court. For the Marblehead and Heartland Projects, the SunCal and Lehman Equity Members were essentially members of the "grandparent" of the bankrupt entities. The bankrupt SPE, parent (or grandparent) company, where applicable, and the SunCal and Lehman Equity Member for each Involuntary Project are, as follows:

| Project | Debtor SPE | Parent (and/or Grandparent) Company | SunCal Equity Member | Lehman Equity Member |
|---|---|---|---|---|
| Century City | SunCal Century City | Lehman SunCal Real Estate Fund | SunCal Four-Project Equity Member | Lehman Four-Project Equity Member |
| Delta Coves | Delta Coves Venture | Delta Coves Master JV | SunCal Delta Coves Equity Member | Lehman Delta Coves Equity Member |
| Heartland | SunCal Heartland | SunCal Marblehead Heartland (owned by SunCal Master JV) | SunCal Marblehead Heartland Equity Member (member of SunCal Master JV) | Lehman Marblehead Heartland Equity Member (member of SunCal Master JV) |
| Marblehead | SunCal Marblehead | SunCal Marblehead Heartland (owned by SunCal Master JV) | SunCal Marblehead Heartland Equity Member (member of SunCal Master JV) | Lehman Marblehead Heartland Equity Member (member of SunCal Master JV) |
| Northlake | SunCal Northlake | N/A | SunCal Northlake Equity Member | Lehman Northlake Equity Member |
| Oak Knoll | SunCal Oak Knoll | Lehman SunCal Real Estate Fund | SunCal Four-Project Equity Member | Lehman Four-Project Equity Member |
| Oak Valley | SunCal Oak Valley | N/A | SunCal Oak Valley Equity Member | Lehman Oak Valley Equity Member |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

| Palm Springs Village | SunCal PSV | Lehman SunCal Real Estate Fund | SunCal Four-Project Equity Member | Lehman Four-Project Equity Member |
|---|---|---|---|---|
| Torrance (Del Amo) | SunCal Torrance | Lehman SunCal Real Estate Fund | SunCal Four-Project Equity Member | Lehman Four-Project Equity Member |

73. For Oak Valley and Northlake, the Lehman Equity Member ostensibly has management and control over the Debtor SPE. For the other seven Projects, the Lehman Equity Members do not have exclusive management and control of the Debtor SPEs' parent (or grandparent), but the Debtor SPEs could not file for bankruptcy without the consent of the Lehman Equity Member, which has refused to provide such consent. Accordingly, all of the Involuntary Projects involve involuntary bankruptcies. The SunCal Equity Members in the Involuntary Debtors—as well as certain creditors of the Involuntary Debtors, including SunCal and SunCal Management—and not the Involuntary Debtors themselves, are bringing the claims relating to the Involuntary Projects. When and if a trustee obtains control of any of the Involuntary Debtors, this complaint will be amended to add such Involuntary Debtors as plaintiffs.

**The Voluntary Debtors**

74. The projects at issue in this suit involving voluntary bankruptcies (the "Voluntary Projects") are: Acton Estates, Beaumont Hills, Bickford Ranch, Del Rio, Joshua Ridge II, Johannson Ranch, Pacific Point,[1] Ritter Ranch, Summit Valley, Tesoro and Emerald Meadows. (The Involuntary Projects and Voluntary Projects are referred to collectively herein as the "Projects," and the Involuntary Debtors and Voluntary Debtors as the "Debtors"). Lehman ALI or LCPI were the lenders on the Voluntary Projects. The difference between the Voluntary Debtors and the Involuntary Debtors is that the former were able to file voluntary bankruptcies (on November 6 and 7, 2008) because their operating agreements did not require Lehman consents to filing. Unlike the Involuntary Debtors, the Voluntary Debtors themselves are plaintiffs in this action.

---

[1] The Pacific Point project is somewhat unique in that the former SunCal affiliated owner, SJD Partners, Ltd., is suing LV Pacific Point, the current owner, for acquiring the property by foreclosure in violation of the parties' agreement and through a course of misrepresentation.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

**The Development Projects**

75. Until 2007, SunCal used its expertise to manage and control development of the Projects. SunCal would contract with third-party vendors to perform grading, health and safety compliance, construction, landscaping, and other necessary services on the Project sites, and would coordinate with municipalities for easements, entitlements and other requirements to proceed with development. SunCal would submit to Lehman documentation of expenses incurred on a quarterly basis, and Lehman in the regular course would remit payment to SunCal so that the third-party vendors could be paid.

76. In or about mid-2007, this relationship between SunCal and Lehman changed, as the real estate market experienced a downturn due to, among other things, the sub-prime mortgage crisis. Many of the Projects declined significantly in value and became insolvent. Lehman thereupon became much more "hands on" in scrutinizing—and approving—budgets and expenses. SunCal would submit budgets on a weekly basis. On a weekly conference call, SunCal would explain what project payables had to paid and what work had to be performed for the projects to avoid immediate closure, and Lehman would have to give pre-authorization before any work could occur or expenses be incurred. Lehman would unilaterally dictate what future work would proceed, and also decided what payables were "urgent" and what other payables could be deferred. Lehman thereby effectively took over not only financial control of the Projects, but ultimate management control as well.

77. Lehman had not only input on, but importantly, veto power over any expenditure undertaken on the Projects. Lehman thus made SunCal and its creditors dependent on Lehman's willingness to continue financing the Projects, and Lehman was in full control over the Projects going forward. Lehman represented that it was in fact willing to continue financing these Projects, and in reliance on that, SunCal contracted hundreds of contractors to provide millions of dollars in work developing and improving the Projects.

**The Parties' "Work-Out" Agreement**

78. SunCal continued to work with Lehman and develop the Projects in anticipation of an overall restructuring of the Projects and of the loans and/or liens held by Lehman. To that end, on

May 23, 2008, SunCal and the other Plaintiffs entered into an omnibus restructuring agreement ("Restructuring Agreement") with LBHI, Lehman ALI and other Lehman-controlled entities. Frank Gilhool ("Gilhool"), Lehman's Managing Director of Global Real Estate, signed the Restructuring Agreement on behalf of both the Lehman Equity Members and the Lehman lenders.

79. The Restructuring Agreement, as amended, was meant to, and did, cover all the Projects at issue in the instant case. The same course of conduct applied to all Projects—that is, Lehman ALI approved and told Plaintiffs what to move forward with—and this applied to all ongoing Projects including those encompassed within the Restructuring Agreement and those not covered by that Agreement, such as Century City, Del Amo, Oak Knoll and Delta Coves.

80. Pursuant to the Restructuring Agreement, Lehman ALI committed, among other things, to: (1) make advances under existing loans to fund the continuing costs necessary to preserve the value of the Projects; (2) move forward to resolve the accrued outstanding subcontractor payables, i.e., to make sure that SunCal's creditors were paid for their work; and (3) to close the transaction whereby Lehman-related entities would assume the debt and obligations of the Projects. The Restructuring Agreement was designed to culminate in closing with the parties entering into a settlement agreement ("Settlement Agreement"), under which new Lehman/SunCal entities would assume Plaintiffs' debt obligations to Lehman, assume certain bond obligations previously owed by SunCal and its affiliates, and provide certain indemnifications to SunCal and other Plaintiffs.

81. SunCal signed the Restructuring Agreement with Lehman ALI with the understanding that Lehman ALI was by that point the entity that held the various first trust deeds or pledged interests on all the Projects. SunCal believed and relied on Lehman's promises to maintain the long-term value of the Projects and that Lehman intended to act in good faith to continue with those Projects.

82. And it appeared—at least for a short while—that might be the case. Lehman arranged for a third party, Radco, to settle outstanding contractor payables. On information and belief, Radco was provided some limited funding and authority to negotiate settlements, and did in fact do so with some creditors. Lehman also provided approval for new work on the Projects, and provided payment for some of it. But this funding was minimal and soon stopped.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

**Lehman Refuses To Close In Accordance With the Restructuring Agreement**

83. In the summer of 2008, SunCal was unaware that a Lehman bankruptcy was impending. Unbeknown to SunCal, the various Lehman entities were proceeding on a coordinated course of conduct designed to shore up Lehman's position in anticipation of a possible bankruptcy and extract any value in the Projects for themselves, in disregard of the promises made to SunCal or the inducements made to the Projects' creditors.

84. About a month prior to filing for bankruptcy, Lehman withdrew funding and settlement authority from Radco, and so halted the process of resolving millions of dollars of outstanding contractor payables on the Projects. This was work that Lehman had previously authorized and directed SunCal to undertake, but that Lehman later refused to pay for. The contractors would not perform new work unless they received payment for work already done. The halting of Radco's efforts further impeded development of the Projects and also impeded the entities' ability to deal with public health and safety issues. Radco ultimately ended up resolving a fraction of the total outstanding payables.

85. On information and belief, Lehman arranged for these negotiations to occur for the secret purpose of staving off creditors from filing involuntary bankruptcies against the Debtors, long enough for Lehman to achieve its fraudulent scheme described herein. Lehman thereby sand-bagged SunCal and the other creditors involved in the projects.

86. In numerous telephone conversations between Gilhool, and SunCal's Frank Faye and/or Bruce Cook ("Cook") in 2008, Gilhool assured SunCal that Lehman was committed to funding the debts and obligations of the projects and the work directed to be performed by Lehman; that funding would be forthcoming; and that SunCal should continue to have contractors undertake work to develop and preserve the value in the Projects. In reliance on these representations, SunCal continued to move forward with the Projects and incurred substantial expenses in hiring contractors to maintain and/or develop them and to deal with public health and safety issues.

87. At an August 25, 2008 meeting to sign closing documents for the Restructuring Agreement held in Los Angeles, Lehman announced that it wanted to push the closing date out another month to September 30, 2008, ostensibly in order to obtain a few additional third party

consents. SunCal, still believing that Lehman was acting in good faith, agreed to the extension to September 30, 2008, not knowing what Lehman was really planning.

88. SunCal and Lehman signed roughly 1000 settlement documents at the August 25 meeting. Lehman's attorneys, Weil, Gotshal & Manges (who are also its bankruptcy counsel), took all of the original signed settlement documents with them, claiming that they would provide copies to SunCal and that the closing would occur shortly thereafter. As of this day, however, Weil Gotshal still has not provided copies of any of those documents.

89. Unbeknownst to SunCal, on or about August 21, 2008—four days before SunCal and Lehman signed the restructuring settlement documents—Lehman ALI transferred its first deeds of trust on some of the Projects to LCPI, a Lehman entity that was not a signatory to either the Restructuring Agreement or the Settlement Agreement. Lehman ALI never provided any notices of transfer to SunCal. On September 15, 2008, LBHI filed for bankruptcy, and on October 5, 2008, LCPI filed for bankruptcy. These transfers by Lehman ALI were improper and should be set aside; and the transferred liens should be subordinated as requested herein.

90. Thus, SunCal unwittingly entered into agreements regarding the restructuring of hundreds of millions of dollars in loans and liens with a Lehman entity that was secretly transferring its first deeds of trust to a soon-to-be bankrupt affiliate. On information and belief, Lehman ALI selectively transferred deeds of trust to LCPI on Projects that did not have a Lehman Equity Member that could block the Projects' SPEs from filing bankruptcy. (For Projects on which a Lehman Equity Member could prevent a voluntary bankruptcy, transfer of the deeds was unnecessary.)

91. The transfers were made on these Projects so that LCPI could use the automatic stay in its own impending bankruptcy to impede a successful reorganization of the Projects, and to prevent any outcome other than a Lehman foreclosure. Lehman thereby schemed to usurp the Projects for itself, without paying creditors for their millions of dollars of work and without performing on any of the agreements made with SunCal.

92. Unbeknownst to Plaintiffs, Lehman ALI also apparently transferred its interests in the loans on Oak Valley and Northlake to OVC and Northlake Holdings, respectively. On information and belief, Lehman ALI made these transfers, and OVC and Northlake accepted these transfers, as

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

part of the Lehman scheme to usurp the Projects, and in knowing violation of the rights of Plaintiffs and/or their creditors.

93. On information and belief, the additional third-party consents required for closing of the Restructuring Agreement and Settlement Agreement had been obtained by the first week of September 2008, and thus all conditions precedent to closing had been met. Yet Lehman took no steps to proceed with closing, apparently planning something else for its own self-serving benefit and to the detriment of the creditors herein including SunCal.

**Lehman's Misrepresentations**

94. On September 15, 2008, LBHI filed a voluntary petition in bankruptcy court in the Southern District of New York. Notwithstanding the bankruptcy, Lehman's Gilhool was still assuring SunCal that Lehman would continue to fund the Projects so as to avoid harm and damage to them and to ensure that creditors were paid.

95. As the end of September approached, SunCal became greatly concerned that Lehman was still not doing anything to facilitate closing. On September 29, 2008, SunCal sent Lehman a notice indicating that they were prepared to close, and that all conditions precedent to closing had been satisfied. Lehman did not provide a definitive response for weeks.

96. In the meantime, the Projects required work. Even if no new construction or development was to be undertaken, significant sums had to be spent on site security, erosion prevention, property taxes and other measures in order to prevent the Projects from becoming a public safety hazard, and in order to prevent losing valuable entitlements and other losses to the Projects.

97. SunCal repeatedly requested that Lehman provide funding to pay for critical health and safety and value preservation measures on the Projects. Between October 9 and November 4, 2008, SunCal's general counsel Cook sent Lehman's Robert Brusco nearly two dozen letters practically begging Lehman to provide promised funding to address critical needs on the Projects. Here's a plea from one of the Cook letters:

98. These letters raised issues such as potential and/or actual public exposure to asbestos, flooding, wind damage, looters and vandals, soil erosion and wildfires, in addition to demands from

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

third-party vendors for payment for services and threats to discontinue service. Cook's letters attached reports from governmental inspectors, and photographs documenting site conditions that posed a threat to public safety or that could subject the Projects to fines and penalties. Cook's letters were in addition to the myriad of correspondence from SunCal employees working on the Projects to Lehman employees requesting payment for previously approved payables or funding for other particular urgent needs.

99. Despite Lehman's assurances of its intent to proceed with funding the Projects, SunCal's request that Lehman address its critical financial needs fell on deaf ears. Lehman repeatedly requested detailed budgets regarding the needs of the Projects, reinforcing the impression that Lehman was willing and able to fund—budgets which SunCal repeatedly and promptly provided. Lehman repeatedly promised the funding would be forthcoming. But the funds never materialized. In November 2008, Lehman's Brusco delivered a message (from an unknown decision-making person or controlling group) that Lehman was unwilling to fund the Projects and that they intended to foreclose on all of the projects.

100. In late October 2008, SunCal indicated to Lehman that if Lehman continued to refuse to provide critical funding, the SPEs for the various Projects would have no choice but to file for bankruptcy. Finally, with creditor demands, fines and penalties and other expenses mounting, and no financial assistance forthcoming from Lehman, the Voluntary Debtors filed for bankruptcy on November 6 and November 7, 2008. When Lehman refused to provide consents to filing as to the Involuntary Debtors, their creditors filed involuntary petitions against them beginning on November 12, 2008. There are approximately 450 vendors owed in excess of $100 million for work and improvements they provided on the Lehman-backed SunCal Projects.

101. Lehman responded to the SunCal bankruptcies with a flurry of activity to try to foreclose on the Projects and avoid its obligations to creditors. On November 13, 2008, Lehman ALI sent SunCal a letter repudiating its prior promises and agreement of continued funding.

102. On November 12, the same day as the first of the SunCal involuntary bankruptcy filings, Lehman ALI rushed to improperly file notices of default against five Projects—Century City, Torrance, Palm Springs Village, Oak Knoll and Delta Coves—that were not yet in bankruptcy.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

Creditors of these Projects then filed involuntary petitions in order to stay foreclosure proceedings on the Projects.

103. On November 18, 2008, the Lehman Equity Members sent certain of the Involuntary Debtors letters stating that the SunCal Equity Members had no authority to consent to an order for relief from stay, nor make any decision on behalf of the Involuntary Debtors. On information and belief, these Equity Members are using their control of the joint SunCal/Lehman entities not to benefit those entities or the Projects they represent, or to meet fiduciary duties to creditors, but solely to facilitate the interests of the Lehman secured lender to effectuate foreclosures.

104. LBHI and LCPI further have used the automatic stay in their own bankruptcy proceedings to try to prevent the Voluntary or Involuntary Debtors from moving forward with their respective bankruptcies and successfully reorganize the Projects. These Lehman entities have refused to consent to relief from the automatic stay in their proceedings, and so have tried to block the Debtors from obtaining priming loans or other financing to pay creditors.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

**Marblehead and Heartland**

105. At the same time that Lehman was stringing SunCal along, promising that funding would be forthcoming but refusing to provide it, Lehman was also secretly stripping the Projects of any value it could. SunCal Marblehead Heartland held approximately $3.4 million in two restricted accounts that were to be used for the needs of the Marblehead and Heartland Projects. Unbeknownst to Plaintiffs, on information and belief, in or about late October or early November 2008—precisely when Plaintiffs were begging that Lehman provide promised funding—the Lehman Marblehead/Heartland Equity Member directed that all the money in those accounts be withdrawn for Lehman's benefit, and then closed the accounts.

106. Plaintiffs did not learn about the withdrawal or account closures until it requested updated bank statements from the financial institution holding the accounts. Lehman never informed Plaintiffs that it was withdrawing the money, and has never explained why the money was withdrawn or what was ultimately done with it. Lehman just grabbed these funds for itself.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

**Pacific Point**

107. Pacific Point is a 200 plus acre development in a premium location overlooking the Pacific Ocean in San Juan Capistrano. Pursuant to the Restructuring Agreement, SunCal agreed not to interfere with Lehman's foreclosure on the Pacific Point property in San Juan Capistrano, and a Lehman entity—LV Pacific Point—would acquire the property, in consideration for Lehman agreeing to assume millions of dollars in outstanding accounts payable for Pacific Point third-party vendors, as well as millions in SunCal bond liability. LV Pacific Point was a signatory to the August 25, 2008 Settlement Agreement, and was supposed to and agreed to acquire the property subject to the above obligations.

108. Lehman foreclosed on Pacific Point on August 28, 2008—three days after all the Settlement Agreement was signed—and title was thereafter transferred to LV Pacific Point. The SunCal entities on the project, SJD Partners, and its parent, SJD Development, filed for bankruptcy in November 2008. But because Lehman wrongfully repudiated the contract and wrongfully refused to provide promised payments in disregard of its multiple assurances, LV Pacific Point was able to acquire the property for itself without assuming the millions in obligations. Had SunCal known that Lehman had no intent to honor its obligations under the contract, it never would have agreed to cooperate with a foreclosure. Instead, it could have filed for bankruptcy earlier, precluded a foreclosure and successfully reorganized the project. The foreclosure should be set aside, and the Lehman interest should be subordinated as requested herein.

**The "New" Lehman**

109. The various Lehman-affiliated entities do not view themselves as and do not act as separate entities with separate interests regarding the Projects. (For example, Gilhool signed the Restructuring Agreement on behalf of both the Lehman Equity Members and the Lehman lenders.) Rather, the various Lehman entities—whether lenders or equity-holders—are acting in concert to usurp the Projects for Lehman's benefit, at the expense of other creditors and equity-holders. And this "concert" is now being orchestrated by a single conductor, Alvarez & Marsal ("A & M"), who is in effect the new principal, controller and decision-maker with respect to the properties in issue herein.

110. When Lehman went into bankruptcy, it retained A & M as its restructuring consultants. In reality, A & M has taken over the company. On information and belief—and per reports in the media—Bryan Marsal of A & M, in his capacity as Chief Restructuring Officer, is "running things now" at Lehman in place of its CEO. According to Lehman's own website, Marsal "and his management team will ensure the orderly restructuring of LBHI and its subsidiaries." The A & M employees assigned to handle restructuring of Lehman's real estate assets even have "lehman.com" e-mail addresses.

111. A & M's control over Lehman extends beyond the bankruptcy. For example, while LBHI and some of its affiliates are in bankruptcy, Lehman ALI, OVC, Northlake Holdings, and the Lehman Equity Members are not. Yet A & M is apparently in control of all of these entities as well. When Lehman repudiated the Restructuring Agreement on November 12, 2008, it did so on behalf of non-bankrupt Lehman ALI, LCPI, OVC and Northlake Holdings by Gerald Pietroforte, one of two "Key A & M Contacts" in charge of Lehman's Real Estate "Asset Recovery Plan, Dispositions, and Pledged Collateral Issues." On November 18, 2008, A & M's Jeff Fitts—the other "Key A & M Contact"—sent letters to the SunCal Equity Members on behalf of the Lehman Equity Members instructing them not to take any action or make any decisions relating the bankruptcy cases on behalf of certain of the Involuntary Debtors.

112. On information and belief, A & M and its asset recovery professionals involved in the Lehman-SunCal projects, Messrs. Fitts and Pietroforte, do not have in-depth hands-on experience or expertise in developing large-scale master-planned residential communities, as are involved here. On the other hand, SunCal and its cadre of experienced land development professionals have a very high level of expertise and experience based on many years and literally thousands of hours—including on the Projects at issue in this case.

113. Instead of ousting SunCal and taking over currently ongoing Projects, and then trying to re-invent the wheel so to speak, common sense and basic fiduciary duties require Lehman and its asset recovery professionals to pursue the course of action best suited to enhancing the value of the Projects and maximizing the recovery to creditors. The takeover/foreclosure strategy they have pursued thus far will result in the worst possible outcome for all concerned.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

114. Indeed, Lehman's lead bankruptcy attorney, Harvey Miller, is quoted in the New York Times as saying that even though Lehman is not going to emerge from bankruptcy, a well-managed bankruptcy nonetheless should produce "a result which benefits people"—including making sure that creditors are paid to the extent possible. Yet when it comes to the land developments that SunCal has expertly managed for years, the A & M strategy has been—and is—the polar opposite: usurp control of the Projects without leaving anything for the hundreds of creditors who did work and conferred value, and in the process squeeze out all the other owners.

## FIRST CLAIM FOR RELIEF

**(Equitable Subordination, 11 U.S.C. §510(c) – By the Voluntary Debtor Plaintiffs and Creditors of the Involuntary Debtors Against the Lehman Lenders and the Lehman Equity Members)**

115. Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

116. Plaintiffs are informed and believe, and on that basis allege, that Lehman ALI is an affiliate of an insider of the Involuntary Debtors, and thus is a statutory insider under 11 U.S.C. §101(31). LBHI has a controlling interest, directly or indirectly, in both Lehman ALI and in the Lehman Equity Members, which have a majority stake in the Involuntary Debtors and are therefore insiders of the Related Debtors. Accordingly, under 11 U.S.C. §101(2), Lehman ALI is an insider of the Debtors. Even aside from its status as a statutory insider, Lehman ALI has exerted actual control over all of the Debtors. Lehman ALI is Debtors' sole source of credit. At least since mid-2007, Debtors' management had to vet each expense with Lehman ALI and get its approval before it could expend any funds to develop the Projects, and had meetings with Lehman personnel on at least a weekly basis for this purpose. Lehman ALI also controlled decisions regarding which creditors would get paid, and engaged Radco to negotiate such payments.

117. Lehman ALI has engaged in conduct that is not only inequitable but egregious, warranting equitable subordination of its claims regardless of its insider status. This inequitable and egregious conduct, described in more detail above, includes, among others: (1) willfully failing to make required advances despite repeated representations that it would do so, thereby preventing

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

Plaintiffs' ability to pay creditors and develop and maintain the Projects, including addressing central health and safety issues; (2) secretly transferring its deeds of trust to an affiliate, LCPI, mere weeks before LCPI filed for bankruptcy, for the purpose of assisting Lehman in using its impending bankruptcy to impede successful reorganization of the Projects; (3) improperly filing notices of default on properties that were not yet in bankruptcy; (4) conspiring with its Lehman parent entity, affiliated lender entities, and even equity partners on the Projects to foreclose on the properties and leave hundreds of creditors in the cold for tens of millions of dollars of work performed; and (5) squeezing out SunCal despite the agreements and representations made by Lehman.

118. Lehman ALI's inequitable conduct resulted in damage not only to the Debtors themselves and to the Debtors' Equity Members but to their creditors as well. Lehman ALI's course of conduct of making repeated assurances, drawing out the process, and ultimately refusing to provide needed funding deepened the Debtors' insolvency, forced them into bankruptcy, and diminished both the value of the Debtors' Projects and the ability of the Debtors to pay their debts as they came due.

119. Furthermore, Lehman ALI's conspiring with its Lehman affiliates to prevent successful reorganization of the Projects once they were in bankruptcy has harmed the prospects of a successful reorganization, or has made such reorganization more difficult and costly, thereby further reducing the prospects of repayment of the Debtors' creditors. The extent of this damage to creditors and others is an amount to be proven at trial, but is, at a minimum, $150 million, plus interest.

120. The Lehman Equity Members, as insiders, have sought to block the Projects' reorganizations in violation of their duties of loyalty. The Lehman Equity Members did so in an effort to facilitate a Lehman foreclosure and to avoid payment of Plaintiffs' creditors as part of the scheme.

121. By reason of the foregoing, Plaintiffs are entitled to equitably subordinate: (1) Lehman ALI's secured claims to the claims of unsecured creditors; and (2) the interest of the Lehman Equity Members to the interests to the other equity members. The value of the claims to be equitably subordinated will be proven at trial, but is no less than $150 million, plus interest.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

Equitable subordination under the circumstances will achieve a result that is consistent with the purposes of the Bankruptcy Code. Furthermore, the Court is entitled to transfer Lehman ALI's liens for the benefit of the Debtors' estates.

**SECOND CLAIM FOR RELIEF**

**(Intentional Misrepresentation – By All Plaintiffs Against All Defendants)**

122. Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

123. Lehman ALI authorized SunCal to have third-party vendors engage in work on the Projects, and represented that it was willing and able to pay for that work. Lehman ALI made such representations, primarily through telephone conversations between Gilhool and SunCal's Cook and/or Faye, for months prior to the May 23, 2008, Restructuring Agreement; after the Restructuring Agreement was signed; and even after LBHI filed for bankruptcy in September 2008. Lehman ALI represented that it was and would be the holder of deeds on the Projects, thus making it the appropriate party with which to enter the Restructuring Agreement. Lehman ALI also represented to SunCal in late August 2008, through its attorneys Weil, Gotshal & Manges, including Nellie Camarik, that closing of the Restructuring Agreement needed to be postponed until the end of September 2008 to obtain additional necessary consents, and that Lehman would work in good faith to obtain such consents.

124. In reliance on these representations, Plaintiffs incurred massive amounts of additional indebtedness by engaging hundreds of vendors to provide millions of dollars worth of work on the Projects; entered into the Restructuring Agreement; and agreed to the extension of the closing date of the Restructuring Agreement.

125. Lehman ALI knew that these material representations were false and untrue and made them with the intent of inducing reliance on the part of Plaintiffs. Lehman has been very secretive about its internal organizational structure, but on information and belief, LBHI, Lehman ALI, LCPI, OVC, and Northlake Holdings were and are all controlled by the same individuals within Lehman management. Indeed, Gilhool signed the Restructuring Agreement on behalf of both LBHI and

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

Lehman ALI, and routinely purported to speak on behalf of both entities, as he presumably was directed by Lehman higher-ups.

126. On information and belief, people above Gilhool within the Lehman organization were in control and were the decision-makers instructing Gilhool what to do and say in this regard; and they may even have kept Gilhool in the dark as to their plans and schemes; and Lehman management was aware in the summer of 2008 that a Lehman bankruptcy was possible if not likely. Specifically, on information and belief, Gilhool's superior at Lehman, Mark Walsh, who was the head of Lehman's real estate department, was in close contact with Lehman's then-CEO, Richard Fuld. These top executives at Lehman were well aware of Lehman's possible bankruptcy.

127. At the same time, the Lehman executives were aware of and in control of Lehman's dealings regarding the Projects. The top Lehman executives were also aware of the representations that Gilhool was making, but directed that they be made and/or ratified their making, with the intention of promoting Lehman's scheme. Without informing Plaintiffs, Lehman ALI secretly transferred first deeds of trusts on certain of the Projects to LCPI shortly before LCPI's bankruptcy, in order to use the automatic stay in LCPI's bankruptcy to impede a successful reorganization of those Projects, force a foreclosure and avoid the millions of obligations to pay third-party vendors that Lehman had undertaken.

128. Lehman ALI thereby promised to pay third parties and encouraged SunCal to incur additional obligations when it knew that Lehman would be repudiating its obligations to pay. And Lehman ALI sought an extension on the closing of the Restructuring Agreement to buy it more time so that the parent, LBHI, could declare bankruptcy, and use that proceeding to impede any alternative to foreclosure.

129. As a direct, actual and proximate result of Lehman ALI's misrepresentations, Plaintiffs suffered extensive damages, in an amount to be proven at trial. Plaintiffs have been damaged in an amount that exceeds $150 million, including indebtedness to third-party vendors for work that Lehman authorized but has not paid for; substantial fines and penalties from municipalities for health and safety violations that Plaintiffs have incurred and will continue to incur; interest and penalties on unpaid taxes; the loss of value to the properties due to water damage, wind and soil

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

erosion and other deterioration, as well as the loss of easements, entitlements, and other rights that are necessary to the preservation and/or development of the properties; and reputational harm vis-à-vis the vendors and subcontractors with which SunCal previously had dealings.

130. Lehman lulled, squeezed and threatened Plaintiffs for months before they signed the Restructuring Agreement in an effort to force Plaintiffs to agree to its terms. Because Lehman strung Plaintiffs along for months, making them believe critical funding would be forthcoming, Plaintiffs incurred more indebtedness than they otherwise would have. Had Lehman made it clear that it had no intention of providing the necessary funding, Plaintiffs could have filed for bankruptcy many months earlier and have not incurred the debt the Projects are currently laboring with.

131. Lehman dragged the process out until Lehman itself filed for bankruptcy, and is now using its own bankruptcy to impede successful restructuring of the Projects that will address the health and safety issues and provide for payment to creditors. Thus, Lehman caused the Debtors' bankruptcies, deepened their insolvency and is trying to prevent them from emerging from bankruptcy or paying any of the other creditors.

132. Lehman ALI and others acted maliciously, wantonly, recklessly and with a deliberate and conscious disregard for the rights of Plaintiffs, and therefore, the Court should award exemplary and punitive damages against them in excess of any compensatory damages all of which should be prior and superior to the Lehman loan.

133. On information and belief, the other Lehman entity defendants were aware of and agreed to participate in the Lehman scheme to defraud Plaintiffs and their creditors, and did so with the intent of promoting the scheme, and are thus liable for Lehman ALI's fraud as co-conspirators. OVC and Northlake took over Lehman ALI's interests in the Oak Valley and Northlake loans to further the scheme. The Lehman Equity Members have also attempted to block the Projects' reorganizations to facilitate a Lehman foreclosure and nonpayment to all of Plaintiffs' creditors as part of the scheme. Lehman ALI also secretly pilfered those Projects' bank accounts for its own benefit at the time when funds were needed the most.

134. On information and belief, in willingly conspiring with Lehman ALI in its fraudulent scheme, these other Lehman defendants acted maliciously, wantonly, recklessly and with a

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

deliberate and conscious disregard for the rights of Plaintiffs, and therefore, the Court should award exemplary and punitive damages against them in excess of any compensatory damages.

135. Subject to discovery and further investigation, plaintiffs hereby reserve the right to name as additional defendants any and all other individuals and/or entities who engaged in the illegal acts described herein.

**THIRD CLAIM FOR RELIEF**

**(Negligent Misrepresentation – By All Plaintiffs Against Lehman ALI)**

136. Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

137. To the extent that the misrepresentations made by Lehman alleged above were not made intentionally and with actual knowledge of their falsity, they were made, at the least, without a reasonable basis for believing them to be true.

138. Plaintiffs not only actually, but reasonably and justifiably, relied on these representations.

139. Plaintiffs were directly and proximately caused harm as a result of these representations, as alleged above, in an amount to be proven at trial, but believed to be in excess of $150 million.

**FOURTH CLAIM FOR RELIEF**

**(Breach of Contract – By All Plaintiffs Against Lehman ALI, OVC, Northlake Holdings, and LV Pacific Point)**

140. Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

141. Plaintiffs entered into the Restructuring Agreement, a valid and binding contract with Lehman ALI, on May 23, 2008.

142. Plaintiffs performed all conditions, covenants and promises required of them under and in accordance with the terms of that agreement.

143. Pursuant to Section 1(h) of the Restructuring Agreement, Lehman ALI agreed to make advances under its loans with SunCal and the Debtors for the payment of critical needs and

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

value preservation of the Projects, and to pay outstanding payables. Lehman ALI further agreed to assume all debt and pay outstanding obligations of the Debtors. All conditions precedent to Lehman ALI fulfilling these obligations were fulfilled, and no excuses for Lehman ALI's nonperformance exist.

144. Despite numerous requests from SunCal to Lehman ALI to make necessary advances, Lehman ALI refused to do so. Lehman withheld authority from its settlement agent, Radco, from settling outstanding payables, and Lehman ALI stopped making advances entirely in or around August or early September, 2008. Lehman's refusal to close on the Restructuring Agreement means that it has also failed to assume millions in bond obligations and other debts and obligations that it was contractually obligated to assume.

145. As a result of Lehman's failure to perform as required under its agreement, Plaintiffs and/or the Debtors have suffered and continue to suffer extensive damages, as described above, in an amount to be proven at trial, but believed to be in excess of $150 million. All of these damages were reasonably foreseeable consequences of Lehman ALI's non-performance.

146. Although neither OVC nor Northlake Holdings were signatories to Plaintiffs' agreement with Lehman, to the extent that these parties have assumed Lehman ALI's role as lender under the agreement, then they have also assumed its obligations under the agreement and are similarly liable for breach thereof.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

**FIFTH CLAIM FOR RELIEF**

**(Breach of Fiduciary Duty – By SunCal and the SunCal Equity Members Against the Lehman Equity Members)**

147. Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

148. By virtue of their relationship as managing and/or controlling members in the Involuntary Debtor SPEs (or in the parent or grandparent entities that are the owners of the Involuntary Debtors SPEs), the Lehman Equity Partners owe fiduciary duties to the SunCal Equity Members and to the Involuntary Debtors. In addition, as of the time that the Involuntary Debtors entered the zone of insolvency, approximately in mid-2007, and following the Involuntary Debtors'

bankruptcy filings, the Lehman Equity Members also owed fiduciary duties to the Involuntary Debtors' creditors, including SunCal and SunCal Management.

149. The Lehman Equity Members owed these parties the duties, among other things, not to willfully use their control of the Debtors to diminish the value of the equity in the Involuntary Debtors' Projects, or to undermine creditors' ability to be repaid by the Involuntary Debtors.

150. The Lehman Equity Members violated these duties by, among other things, failing to take any steps to cause or consent to a voluntary bankruptcy filings for the Involuntary Debtors, when such filings would best preserve the equity value of the Projects and the ability to pay all the creditors; squeezing Plaintiffs for months before the parties executed the Restructuring Agreement, thereby forcing Plaintiffs to agree to its terms; and by conspiring with their Lehman affiliates to block successful reorganization of the projects.

151. The Lehman Equity Members' breaches of these fiduciary duties have caused damage to Plaintiffs, as described above, in an amount to be proven at trial, but believed to be in excess of $150 million.

152. On information and belief, in doing the acts alleged herein above, the Lehman Equity Members acted intentionally, recklessly, willfully, oppressively, and maliciously, in placing the interests of Lehman debt-holders and themselves above those of the Debtors, the other equity holders, and the other creditors. These defendants had actual knowledge that their conduct constituted a breach of their fiduciary duties. Plaintiffs are entitled to an award of punitive and exemplary damages in an amount to be determined according to proof at trial in an amount sufficient to punish these defendants and to deter them from engaging in such conduct in the future.

**SIXTH CLAIM FOR RELIEF**

**(Turnover of Property – By Plaintiff SunCal Heartland, LLC and Plaintiff SunCal Marblehead, LLC Against Defendant Lehman ALI)**

153. Plaintiffs repeat and reallege each and every foregoing allegation contained in the Complaint, and further allege as follows:

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

154. In or about late October or early November of 2008, Defendant Lehman ALI caused the sweeping of $3.4 million from two restricted accounts that were specifically earmarked for Plaintiff SunCal Heartland LLC and SunCal Marblehead LLC.

155. Defendant Lehman ALI has been in possession of such funds since such time and has failed and refused to turn over such funds as required by 11 U.S.C. Section 542.

## SEVENTH CLAIM FOR RELIEF

**(For Award of Attorneys' Fees and Costs – By All Plaintiffs Against All Defendants)**

156. Plaintiffs repeat and reallege each and every foregoing allegation contained in the Complaint, and further allege as follows:

157. Based on the foregoing allegations, Plaintiffs are entitled to reasonable attorneys' fees and costs incurred in connection with this action pursuant to Rule 7008(b) of the Federal Bankruptcy Rules. Plaintiffs' attorney's fees and costs should be superior to any claims made by Lehman to the extent permitted by law.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray that this Court enter a judgment against Defendants as follows:

1. For equitable subordination to the unsecured creditors and equity holders of all liens or other claims held by Lehman ALI, OVC, Northlake and other Lehman-related parties, including without limitation any and all transferees thereof, and for preservations of such liens and/or claims for the benefit of the Debtors' estates;

2. For a money judgment against all Defendants, in an amount to be proven at trial, of at least $150 million;

3. For an order invalidating the foreclosure sale of the Pacific Point property to LV Pacific Point, imposing a constructive trust on LV Pacific Point directing it to transfer title of the Pacific Point property back to SJD Partners;

4. For an order compelling Lehman ALI to turn over the $3.4 million to the trustee pursuant to 11 U.S.C. § 542(a) and disallowing any and all claims of Lehman ALI until such funds are turned over pursuant to 11 U.S.C. § 502(d);

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

5. For attorneys' fees and costs incurred in this action;

6. For an award of exemplary damages against all Defendants;

7. For pre-judgment and post-judgment interest at the maximum legal rate;

8. For such other and further relief as this Court may, in its discretion, deem just and proper.

DATED: January 6, 2009

MILLER BARONDESS, LLP

By: ______________________
Louis R. Miller
Attorneys for Plaintiffs

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

ORIGINAL

FORM B104 (08/07) — 2007 USBC, Central District of California

## ADVERSARY PROCEEDING COVER SHEET
(Instructions on Page 2)

**ADVERSARY PROCEEDING NUMBER** (Court Use Only)

RECEIVED
JAN - 6 2009
CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY Deputy Clerk

| **PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| SCC ACQUISITIONS, INC., etc., et al. | LEHMAN ALI, INC., etc., ~~et al.~~ |
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>MILLER BARONDESS, LLP<br>1999 Avenue of the Stars, Suite 1000<br>Los Angeles, CA 90067 (310) 552-4400 | **ATTORNEYS** (If Known) |
| **PARTY** (Check One Box Only)<br>☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor ☐ Other<br>☐ Trustee | **PARTY** (Check One Box Only)<br>☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor ☐ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Equitable Subordination Pursuant to 11 U.S.C. section 510(c) in connection with $150 million in bills and liabilities.

### NATURE OF SUIT
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☒ 11-Recovery of money/property - §542 turnover of property
- ☐ 12-Recovery of money/property - §547 preference
- ☐ 13-Recovery of money/property - §548 fraudulent transfer
- ☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- ☒ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)
  Intentional and negligent Misrepresentation; Breach of Fiduciary Duty

| | |
|---|---|
| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
| ☐ Check if a jury trial is demanded in complaint | Demand $ In excess of $150 million |

Other Relief Sought

FORM B104 (08/07), page 2 2007 USBC, Central District of California

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>PALMDALE HILLS PROPERTY, LLC, et al. | | BANKRUPTCY CASE NO.<br>8:08-bk-17206-ES |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District | DIVISIONAL OFFICE<br>Santa Ana | NAME OF JUDGE<br>Hon. Erithe Smith |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE January 6, 2009 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Brian A. Procel | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendents.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not presented by an attorney, the plaintiff must sign.